[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15459
Non-Argument Calendar

_____

D.C. Docket No. 7:13-cv-00026-HL-TQL

JERMICHAEL PEARSON,

Plaintiff-Appellant,

versus

WARDEN CEDRIC TAYLOR,
DEPUTY WARDEN CALVIN ORR,
DEPUTY WARDEN TED PHILBIN,
CERT TEAM OFFICER ROBERT WESTON,

Defendants-Appellees,

WARDEN WILLIAM DANFORTH, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(December 20, 2016)

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Jermichael Pearson, a Georgia state prisoner proceeding *pro se*, filed a civil-rights complaint under 42 U.S.C. § 1983 alleging claims under the Eighth Amendment against several employees of the Georgia state prison system. He alleged that CERT Team Officer Robert Weston used excessive force by maliciously pepper spraying him and that the other defendants, Deputy Warden Ted Philbin, Deputy Warden Calvin Orr, and Warden Cedric Taylor, were deliberately indifferent to his medical needs after the use of excessive force. The district court granted summary judgment to Weston on the excessive-force claim and dismissed the deliberate-indifference claims for failure to exhaust administrative remedies.

On appeal, Pearson argues that the district court erroneously granted summary judgment to Weston because material facts are in dispute. Furthermore, he contends that the Georgia Department of Corrections's ("GDOC") use-of-force policy is unconstitutional, and he asks for leave to amend his complaint to add GDOC policymakers Brian Owens and "Mr. Tillman" as defendants. Finally, he asserts, the district court improperly resolved factual disputes in deciding whether he had exhausted his administrative remedies, erred in concluding that the

2

administrative remedies were "available," and abused its discretion by not allowing him to amend his complaint to show exhaustion.

After a careful review of the record and consideration of the parties' briefs, we conclude that the district court improperly granted summary judgment to Weston, and we vacate and remand for further proceedings on Pearson's excessive-force claim. We affirm the district court in all other respects.

## I.  FACTUAL BACKGROUND

We first present the facts relevant to Pearson's excessive-force claim against Weston. For clarity, and because Weston disputes whether Pearson's version of events must be credited at summary judgment, we set forth the parties' distinct versions of the relevant events, as well as a summary of other record evidence, including a video recording.

### A.    *Pearson's Version of Events*

On January 15, 2013, an inmate escaped his cell at Valdosta State Prison and stabbed another inmate repeatedly with a metal shank. The attacker then threw the shank into Pearson's cell and threatened him not to tell anyone.

When prison officers responded to the attack, Pearson discreetly obtained Officer Weston's attention. Weston came over and saw the shank on the floor of Pearson's cell. Weston told Pearson to hand over the shank, but Pearson refused, stating that he did not want to risk disease because the shank was covered in blood.

3

Pearson offered to be handcuffed so that Weston could retrieve the shank. Apparently ignoring Pearson's offer, Weston again ordered Pearson to hand him the shank and threatened to use pepper spray if he did not. Pearson asked why Weston would pepper spray him if he was not a threat to security, other inmates, or himself.

At that point, Weston, wielding a "riot-size" canister of pepper spray, deployed pepper spray at Pearson and into his cell for one to two minutes. Because Pearson was wearing only underwear at the time, the spray hit all parts of his body, including, most notably, his eyes. The spray caused Pearson to vomit blood and mucus and to faint for around five minutes. He awoke to Weston and another officer yelling at him to stand up and come to the cell door to be handcuffed. Pearson responded that he could not breathe or stand up. Weston deployed a second burst of pepper spray, this time for ten to fifteen seconds. Pearson was near the back of the cell for the second burst, so it did not directly hit him, but he pled for time to compose himself and for Weston not to use pepper spray again. During this time, Weston and the other officer shouted abusively and harshly ordered him to come to the door to "cuff up." Pearson eventually did so.

Weston and other officers escorted Pearson from his cell to a shower cell, where he waited for around twenty minutes for the nurse to arrive. While waiting in the shower, Pearson vomited blood and mucus. When the nurse arrived, she

4

conducted what Pearson claims was an improper evaluation and then told him that he would recover in twenty-four hours when the pepper spray wore off. Pearson was not allowed to shower either before or after the nurse's evaluation.

When the nurse left, Weston escorted Pearson back to his cell. Along the way, Weston "spitt[ed] obscenities" at Pearson and stomped on his bare feet. When they reached Pearson's cell, the chemical agents from the pepper spray still lingered in the air. Pearson's cell door had remained closed while he was in the shower cell, and ventilation in the cells was otherwise poor. Pearson asked for but was refused cleaning supplies to decontaminate his cell.

Pearson claimed that the exposure to pepper spray damaged his eyes. He asserted that he has suffered from temporary blindness, blurry vision, and other vision complications since the incident.

## B.    *Weston's Version of Events*

Weston provided the same basic outline of events, but he contradicted Pearson on several key facts. According to Weston, when he responded to the stabbing incident, he saw Pearson standing in his cell holding a bloody shank. Weston ordered Pearson four separate times to either hand over the shank or come to the cell door to be handcuffed. Pearson refused and instead tried to flush the shank down the toilet.

Deciding he needed to recover the shank as quickly as possible for safety and security reasons, Weston deployed a three-second burst of pepper spray into Pearson's cell and then shut the tray slap to let the spray take effect. Weston did not observe Pearson coughing, vomiting, or fainting. After the single use of pepper spray—the only time pepper spray was used—another officer began recording the incident with a video camera. Pearson eventually came to the door to be handcuffed after a different officer threatened to use pepper spray again. Pearson was taken to a shower cell to be seen by a nurse, and he was permitted to shower after the nurse saw him.

## C.    *Other Relevant Evidence*

The nurse who examined Pearson executed an affidavit in which she stated that she completed a "use of force" assessment when she examined Pearson on January 15, 2013. The nurse stated that she did not observe any objective medical symptoms or injuries that would indicate that an excessive amount of pepper spray had been used. The nurse did not see any vomit, blood, or mucus on the floor of the shower. Pearson was not allowed to shower before the examination, the nurse said, but he showered afterward. The nurse, referencing medical records attached to the affidavit, stated that Pearson had complained of vision problems multiple times before January 15, 2013.

6

The record also includes a DVD with a video recording, lasting just over eight minutes, taken by one of the officers. The video begins after any use of pepper spray and ends with Pearson in the shower waiting for the nurse. Near the beginning of the video, Pearson is depicted standing in his cell, walking around, and refusing to comply with officers' directives to turn over the shank or be handcuffed. Only a small portion of his cell is visible, however, as the camera is often pointed at the wall or the door, or the view is otherwise obscured by officers. Eventually Pearson allows himself to be handcuffed, and he is then escorted out of his cell, walking under his own power, and taken to a shower cell where he waits to be examined by the nurse. Pearson's face is visible only briefly during these events, but his eyelids appear noticeably swollen. No vomiting is clearly depicted, but Pearson appears to be hunched over and coughing while in the shower cell at the end of the video.

## II. PROCEDURAL HISTORY

Pearson filed his "recast" complaint in June 2013, alleging violations of the Eighth Amendment. He alleged that Weston used excessive force against him by maliciously pepper spraying him and that the other defendants—Orr, Philbin, and Taylor—were deliberately indifferent to his pain and suffering by denying him medical and mental-health treatment after the pepper-spray incident.

Orr, Philbin, and Taylor moved to dismiss the complaint against them for failure to exhaust administrative remedies. They asserted that the only grievance Pearson filed relating to the incident did not raise any issue about medical care or name the three defendants. Pearson responded that these defendants were put on notice through other means. Later, Pearson sent a letter to the magistrate judge stating that he had proof of exhaustion and asking for permission to amend his complaint. He attached an informal grievance he filed before the January 2013 incident and several other documents relating to the substance of that grievance, which concerned Pearson's fear of harm from gang members.

Weston moved for summary judgment on the excessive-force claim. He argued that Pearson's version of events was contradicted by the video recording, the nurse's testimony, and Pearson's medical records. He contended that summary judgment was appropriate because Pearson could not establish that he used force maliciously or sadistically. Pearson responded that summary judgment should not be granted because genuine disputes of material fact remained, the GDOC's use-of-force policy was unconstitutional, and the officers failed to record the use of force as they were supposed to. Pearson attached an affidavit in which he largely reiterated his deposition testimony and clarified some facts in response to Weston's motion and the video evidence.

8

A magistrate judge prepared two reports and recommendations ("R&R") on Pearson's claims. In the first R&R, the magistrate judge recommended that the claims against Orr, Philbin, and Taylor be dismissed for failure to exhaust administrative remedies. According to the magistrate judge, these defendants "establishe[d] the presence of a grievance system at Valdosta State Prison and establishe[d] that the Plaintiff did not complete the grievance process regarding his deliberate indifference claims prior to filing this lawsuit."

In the second R&R, the magistrate judge recommended that summary judgment be granted to Weston on the excessive-force claim. Initially, the magistrate judge identified the following factual disputes relevant to this claim: (a) whether Weston initially gave Pearson the option of being handcuffed so that Weston could enter the cell; (b) whether the pepper spray was deployed once or twice; (c) the length of the first spray blast, whether one to two minutes or just three seconds; and (d) whether the spray caused Pearson to suffer vomiting, difficulty breathing, loss of consciousness, and eye damage.

The magistrate judge determined that, even after resolving these factual disputes in Pearson's favor, the force used by Weston was *de minimis* and did not amount to a constitutional violation. Because Pearson was non-compliant with Weston's orders throughout the encounter, the magistrate judge reasoned, "[a]ny factual disputes involving the length of the first burst of pepper spray and whether

a second burst occurred, do not create a reasonable inference that Defendant Weston acted maliciously and sadistically to cause harm." In addition, the magistrate judge found, Weston's decision to use pepper spray instead of physical contact demonstrated an attempt to temper the force used.

Despite indicating that the factual disputes identified above were not material, the magistrate judge also appears to have found that Pearson's version of events simply could not be credited. The magistrate judge stated that Pearson "presented no evidence beyond the bare assertions of his recast Complaint, repeated in his affidavit and deposition testimony, to establish Defendant Weston's use of force," and that Pearson's version of events was contradicted by all of the relevant evidence other than his own testimony.

Over Pearson's timely objections, the district court adopted the magistrate judge's R&Rs. This appeal followed.

### III.  DISCUSSION

#### A.    *Summary Judgment on Excessive-Force Claim against Weston*

We review the grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party, Pearson, and drawing all reasonable inferences in his favor. *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010). We do not weigh the evidence or make credibility determinations about competing affidavits. *See Reeves v. Sanderson Plumbing*

10

*Prods., Inc.*, 530 U.S. 133, 150–51 (2000).  Thus, "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) (*en banc*) (emphasis omitted).

Nevertheless, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Thus, where an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible." *Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013).  But even where the entire series of events is recorded, video evidence is not obviously contradictory if it fails to convey spoken words or tone, or fails to provide an unobstructed view of the events. *Pourmoghani-Esfahani*, 625 F.3d at 1315.   In *Pourmoghani-Esfahani*, for example, we declined to rely on video evidence to entirely discredit the plaintiff's version of events because the video lacked sound and was periodically obstructed. *Id.* at 1315, 1316 n.2.

The Eighth Amendment prohibits prison officers from using excessive force against prisoners.  *Thomas v. Bryant*, 614 F.3d 1288, 1303–04 (11th Cir. 2010). The "core judicial inquiry" for an excessive-force claim is "whether force was

11

applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

The Supreme Court has "rejected the notion that 'significant injury' is a threshold requirement for stating an excessive force claim." *Id.* Thus, while *de minimis* uses of force, absent exceptional circumstances, do not violate the constitution, *de minimis* injury does not necessarily bar a prisoner's excessive-force claim. *Id.* at 37–38. In other words, a prisoner "does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 38. The extent of injury remains a relevant consideration and may provide an indication of the amount of force applied, but "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Id.* at 37–38.

We have identified five factors to help evaluate whether force was applied maliciously or sadistically. *See Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008), *overruled on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). They include the following: (1) the need for force; (2) the relationship between that need and the amount of force used; (3) the extent of the resulting injury; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible official on the basis of facts known to that

official; and (5) any efforts made to temper the severity of the use of force. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)); *see also Fennell v. Gilstrap*, 559 F.3d 1212, 1218–20 (2009) (applying these factors). When evaluating whether the force used was excessive, we give broad deference to prison officials acting to preserve discipline and security. *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990).

In general, prison officers are authorized to use force when a prisoner repeatedly fails to obey an order. *Danley*, 540 F.3d at 1307. Officers are not required to convince every prisoner that their orders are reasonable and well-thought out before resorting to force. *Id.*

Moreover, we have recognized that "[p]epper spray is an accepted non-lethal means of controlling unruly inmates." *Id.* It is designed to be disabling without causing permanent physical injury and is a reasonable alternative to escalating a physical confrontation. *Id.* at 1308. Therefore, "[a] short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." *Id.* at 1307–08. A "short" burst is around five seconds or less. *See id.* (collecting cases).

Even when an initial use of force is constitutional, however, prison officers may still violate the constitution by failing to temper the severity of their forceful response. *See id.* at 1308–09. For example, subjecting a prisoner to special

13

confinement that causes him to suffer increased effects of environmental conditions—like pepper spray lingering in a small cell or on the inmate—can constitute excessive force. *Id.* Pepper spray acts "by causing intense pain, a burning sensation that causes mucus to come out of the nose, an involuntary closing of the eyes, a gagging reflex, and temporary paralysis of the larynx." *Id.* at 1309 (citations and internal quotation marks omitted). "Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need." *Id.* Therefore, the use of pepper spray immediately followed by confinement in a small, poorly ventilated, pepper-spray filled cell, when the inmate is no longer resisting, can constitute excessive force. *See id.*

Here, the district court improperly granted summary judgment in favor of Weston. Crediting Pearson's version of events and drawing all reasonable inferences in his favor, Pearson's sworn testimony creates a genuine issue of material fact as to "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *See Wilkins*, 559 U.S. at 37.

Two factors in particular weigh in favor of finding a constitutional violation. First, even assuming that Weston was authorized to use force based on the presence of the shank in Pearson's cell and Pearson's refusal to hand over the shank as ordered, *see Bennett*, 898 F.2d at 1533, Pearson's testimony indicates that

14

the force used was grossly disproportionate to the need for force.  According to

Pearson, Weston did not use a "short burst" of pepper spray to enforce compliance

with his orders, *see Danley*, 540 F.3d at 1307, but rather sprayed Pearson and his

cell for at least 60 seconds, causing him to vomit mucus and blood and to lose

consciousness.  Then, after Pearson woke up and was having difficulty breathing

or standing, and may not have been able to comply with Weston's orders at the

time, Weston hit him again with a ten-to-fifteen second burst of pepper spray.  *See*

*id.* at 1309 (using force against an incapacitated inmate is excessive).  From this

evidence, a reasonable factfinder could conclude that the force Weston used went

far beyond the need for control and instead reflected an intent to maliciously and

sadistically cause Pearson harm.[1]

Second, Pearson's sworn testimony creates genuine issues of material fact as

to whether Weston did enough to temper the severity of the forceful response.  *See*

*id.* at 1308–09.  As Weston acknowledges, "[t]he record contains disputed

evidence regarding whether Pearson was permitted to shower following the

incident."  *See id.* at 1310 (concluding that the defendants' failure to allow the

plaintiff to shower for "the amount of time required by jail policy" was

---

[1] Pearson also testified that Weston used vulgar language toward him after deploying pepper spray but before the video recording began.  A jury could consider this abusive language as part of the totality of the circumstances relevant to determining Weston's subjective state of mind. *See Bozeman v. Orum*, 422 F.3d 1265, 1271 n.11 (11th Cir. 2005) (noting that threatening language "can be relevant to . . . the determination of reasonable inferences about the Officers' subjective state of mind").

circumstantial evidence of malicious intent).  Although it appears that Weston personally did not prevent Pearson from showering, Weston was present at the shower cell, so it is reasonable to infer that he was aware that Pearson had not been able to wash the pepper spray from his face or body.  But despite this knowledge, Weston returned Pearson to his pepper-spray filled, poorly ventilated cell without providing any means for him to decontaminate himself or the cell.  These facts indicate that Weston did not do enough to temper the severity of his forceful response and continued to subject Pearson to force—lingering pepper spray in the air and on his body—well after Pearson stopped resisting.  *See id.* ("The use of force in the form of extended confinement in the small, poorly ventilated, pepper spray-filled cell, when there were other readily available alternatives, was excessive.").

In support of the district court's summary-judgment ruling, Weston mainly argues that Pearson's version of events is implausible and cannot be credited when contrasted with all other evidence in the record.  Relying on the nurse's affidavit and Pearson's medical records, Weston stresses that Pearson suffered only *de minimis* injuries from the use of pepper spray.  However, the nurse's affidavit and medical records, even if credited, refute Pearson's allegations only as to the severity or existence of Pearson's injuries.  The nurse does not claim to have witnessed any portion of the allegedly excessive use of force.  And our inquiry is

16

not whether Pearson met a certain arbitrary injury requirement, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins*, 559 U.S. at 37. Pearson "does not lose his ability to pursue an excessive force claim merely because he ha[d] the good fortune to escape without serious injury." *Id.* at 38. Therefore, even if Pearson overstates his alleged injuries, Weston is not entitled on that basis to judgment as a matter of law.

Weston next argues that Pearson's version of events, particularly as to the amount of pepper spray discharged in his cell, is contradicted by the video evidence and the nurse's use-of-force assessment. However, again, the nurse was not present for the allegedly excessive use of force and her testimony mainly speaks to the severity or existence of Pearson's injuries, so her testimony and use-of-force assessment do not clearly contradict Pearson's version of events. Moreover, Pearson claims the nurse's examination was inadequate. In any case, to the extent there is a conflict between the nurse's and Pearson's testimony, we credit Pearson's version of the events for purposes of resolving Weston's motion for summary judgment. *See Evans*, 407 F.3d at 1278; *see also Jackson v. West*, 787 F.3d 1345, 1357 n.6 (11th Cir. 2015) ("One cannot 'refute' a witness's statements using another witness's statements at summary judgment; such a swearing contest is one for the jury to resolve.").

17

Nor does the video evidence "completely and clearly" contradict Pearson's testimony such that no reasonable jury could credit it. *See Morton*, 707 F.3d at 1284. The video does not depict any of the events critical to Pearson's claim. The video begins after any use of pepper spray and ends before Pearson was examined by the nurse. In addition, the video fails to provide an unobstructed view of the events it does depict, such as the inside of Pearson's cell. *See Pourmoghani-Esfahani*, 625 F.3d at 1315. To the extent that the video provides some reason to doubt the veracity of some aspects of Pearson's account, it is not so "blatantly contradict[ory]" that we may entirely disregard Pearson's version of events for purposes of summary judgment. *See Scott*, 550 U.S. at 380.

In sum, Pearson has presented sufficient evidence to establish a genuine dispute of material fact as to whether Weston used excessive force against Pearson, in violation of the Eighth Amendment. We therefore vacate the district court's order granting summary judgment in favor of Weston and remand for further proceedings.

**B.    *Dismissal for Failure to Exhaust Administrative Remedies***

Pearson next argues that the district court erred in dismissing his deliberate-indifference claims for failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA") and abused its discretion by denying his request for leave to amend to plead exhaustion.

18

We review *de novo* a district court's interpretation and application of the PLRA's exhaustion requirement, codified in 42 U.S.C. § 1997e(a). *Johnson v. Meadows*, 418 F.3d 1152, 1155 (11th Cir. 2005). We review the denial of a motion to amend a complaint for an abuse of discretion, but we review questions of law *de novo*. *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1291 (11th Cir. 2007).

The PLRA requires prisoners who wish to challenge some aspect of prison life, including excessive-force claims, to exhaust all available administrative remedies before resorting to the courts. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see* 42 U.S.C. § 1997e(a). Exhaustion is mandatory under the PLRA, and unexhausted claims cannot be brought in court. *Jones v. Bock*, 549 U.S. 211 (2007). Before a remedy must be exhausted, however, it must be "available" and capable of accomplishing its purpose. *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008).

When a state provides a grievance procedure for its prisoners, a prisoner "alleging harm suffered from prison conditions must file a grievance and exhaust the remedies available under that procedure before pursuing a § 1983 lawsuit." *Johnson*, 418 F.3d at 1156 (quotation marks omitted). But a prisoner need not necessarily "name any particular defendant in a grievance to properly exhaust his claim." *Parzyck v. Prison Health Servs. Inc.*, 627 F.3d 1215, 1218–19 (11th Cir.

19

2010).   Rather, a grievance is sufficient to exhaust so long as it alerts prison officials to the problem and gives them an opportunity to resolve it before being sued.  *Id.*  That is because the PLRA's "exhaustion requirement is designed to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued."  *Id.* at 1219 (internal quotation marks omitted).

In response to a prisoner lawsuit, defendants may file a motion to dismiss and raise as a defense the prisoner's failure to exhaust administrative remedies. *Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015). Defendants bear the burden of proving that the plaintiff failed to exhaust his administrative remedies.  *Turner*, 541 F.3d at 1082.

In *Turner*, we established a two-step process for deciding motions to dismiss for failure to exhaust under the PLRA.  *Id.*  District courts first should compare the factual allegations in the motion to dismiss and those in the prisoner's response and, where there is a conflict, accept the prisoner's view of the facts as true. *Whatley*, 802 F.3d at 1209.  "The court should dismiss if the facts as stated by the prisoner show a failure to exhaust."  *Id.*  Second, if dismissal is not warranted at the first stage, the court should make specific findings to resolve disputes of fact, "and should dismiss if, based on those findings, defendants have shown a failure to exhaust."  *Id.*

Here, the district court did not err in granting the motions to dismiss filed by Orr, Philbin, and Taylor.  At the first step of the *Turner* analysis, the court found that Pearson's allegations arguably showed that dismissal was not warranted, so the court proceeded to the second step and concluded that the defendants had met their burden of showing that Pearson failed to exhaust.  At the second step, the court was permitted to make factual findings to resolve the issue of exhaustion. *See id.*  We therefore reject Pearson's assertion that the court improperly resolved factual disputes.

The district court did not err in finding a failure to exhaust.  The defendants presented evidence that a grievance system was in place at Valdosta State Prison at the time of the incident and that Pearson had filed several grievances in the past.  And there is no dispute that Pearson filed just one grievance related to the January 15, 2013, pepper-spray incident.  In that grievance, Pearson did not mention Orr, Philbin, or Taylor, nor did he include any complaint about a denial of medical care or any injuries he suffered from Weston's use of pepper spray.  As a result, the grievance would not have alerted prison officials to the problem and given them an opportunity to resolve it before being sued.  *See Parzyck*, 627 F.3d at 1218–19. Accordingly, the defendants met their burden of showing that Pearson failed to exhaust his administrative remedies under the grievance system before bringing suit under § 1983.  *See Johnson*, 418 F.3d at 1156.

21

We are not persuaded by Pearson's arguments that the grievance procedure was not "available" for exhaustion of his deliberate-indifference claim. Pearson first argues that the grievance procedure was unavailable because Philbin and Taylor left Valdosta State Prison shortly after the pepper-spray incident, so filing a grievance would have been ineffective. However, Pearson does not explain why the grievance system could not have provided some remedy for his problem, despite the departure of the specific defendants. *See Parzyck*, 627 F.3d at 1218–19. And "the exhaustion requirement cannot be waived based upon the prisoner's belief that pursuing administrative procedures would be futile." *Higginbottom v. Carter*, 223 F.3d 1259, 1261 (11th Cir. 2000).

Pearson next contends that the grievance procedure was unavailable because GDOC policy prevented him from having more than two grievances active at any one time and from listing multiple issues in a single grievance. Because he had two active grievances (including the use-of-force grievance), he asserts, he was prevented from grieving the denial of medical treatment.

We are not persuaded that these aspects of the policy render the grievance process unavailable for purposes of the PLRA. In the Supreme Court's recent decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), the Court distilled three situations in which an administrative remedy is not "available" under the PLRA. First, "an administrative procedure is unavailable when (despite what regulations

22

or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, a remedy is not available "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. Here, Pearson's arguments regarding availability do not appear to fall within any of these three "exceptions" to exhaustion.

Furthermore, the Supreme Court has held that "to properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218 (internal quotation marks omitted). Here, the limitations of which Pearson complains were defined by the prison grievance process itself. And while Pearson was limited to two active grievances at any one time, the defendants' evidence reflected that GDOC policy allowed him to withdraw a pending grievance and file a new one. Thus, Pearson had an available route to exhaust his claims regarding the denial of medical treatment according to the applicable procedural rules, even if it would have required him to prioritize his grievances.

Finally, Pearson has not shown that dismissal was inappropriate even if his request for leave to amend had been granted.  The documents that Pearson attached to his letter requesting leave to amend did not relate to the issue of whether he exhausted his deliberate-indifference claims.   Rather, the new documents concerned Pearson's attempts to get prison officers to take some action to protect him because his life had been threatened by gang members.   Accordingly, Pearson's proposed amendments would have been futile.

For the reasons stated, we affirm the dismissal of the deliberate-indifference claims against Orr, Philbin, and Taylor.

## C.    *Pearson's Request for Leave to Amend on Appeal*

Finally, Pearson argues that the GDOC's use-of-force policy is unconstitutional, and, for the first time on appeal, he asks that he be allowed to amend his complaint to add GDOC policymakers Owens and Tillman as defendants.

While Pearson asserted that the GDOC's use-of-force policy was unconstitutional in response to Weston's motion for summary judgment, he did not ask for leave from the district court to amend his complaint to add this claim or to join Owens and Tillman as defendants.  Plaintiffs cannot amend their complaints "through argument in a brief opposing summary judgment," but must instead seek to amend the complaint in accordance with Rule 15, Fed. R. Civ. P. *Gilmour v.*

*Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).  Because Pearson raises the issue of whether he should be permitted to amend his complaint through Rule 15 for the first time on appeal, we will not consider the issue.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court." (internal quotation marks omitted)).

## IV.  CONCLUSION

For the reasons stated, we vacate the grant of summary judgment on Pearson's claim that Weston used excessive force against him, in violation of the Eighth Amendment, and we remand for further proceedings on this claim.  We affirm the dismissal of Pearson's deliberate-indifference claims for failure to exhaust administrative remedies.

**AFFIRMED in part; VACATED in part and REMANDED for further proceedings.**