[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11697
Non-Argument Calendar
_____

D.C. Docket No. 5:16-cv-00405-WTH-PRL

JOSE MONTALBAN,

Plaintiff-Appellant,

versus


JOHN DOE, S.I.S. Officers,
FNU BOLLEY, Unit manager for B-Unit, et al.,

Defendants-Appellees.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 12, 2020)

Before GRANT, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Jose Montalban, a federal prisoner proceeding *pro se*, appeals the district court's dismissal of his complaint for failure to exhaust administrative remedies in his action alleging civil rights violations under 42 U.S.C. § 1983.  On appeal, he argues that the district court erred by not applying the steps we laid out in *Turner v. Burnside*, 541 F.3d 1077 (11th Cir. 2008), and that he was not required to exhaust his claims because the administrative remedies ostensibly provided by federal regulations were practically unavailable to him due to a serious threat of retaliation by prison officials, as well as a failure on the Bureau of Prisons' part to comply with the regulatory requirements.  After carefully reviewing the record and arguments before us, we agree.  The district court failed to take Montalban's allegations as true, as the first *Turner* step requires, and did not sufficiently resolve the relevant factual disputes, as the second *Turner* step requires.  Accordingly, we vacate the district court's order dismissing his claim and remand the case to the district court for further proceedings.[1]

## I. BACKGROUND

---

[1]    Montalban also argues that the district court erred by denying his motion for reconsideration.  Because we have vacated the district court's order, we need not address Montalban's argument regarding reconsideration.  He also filed motions for miscellaneous relief and to supplement the record.  We DENY AS MOOT all pending motions.  Because we vacate, Montalban will have the opportunity to supplement the record on remand.

Taking the allegations in his third amended complaint as true, Montalban was a federal inmate initially incarcerated at the Federal Correctional Complex in Cannan, Florida. However, after he was charged with forcibly assaulting and resisting a correctional officer and inflicting bodily harm with a dangerous object while at Cannan, he was transferred to the Federal Correctional Complex in Coleman, Florida.

Montalban appealed the charges and was placed in the Special Housing Unit at Coleman after refusing to give two officers information about his appeal. After being released from the SHU, Montalban submitted BP-9 forms to the Coleman warden on August 28, 2014, alleging inadequate medical treatment for a collarbone injury, to which he never received a response. He asked his unit team about property and legal materials that had been missing since he was transferred to Coleman, and his counselor informed him that he would not be getting anything back.

His subsequent efforts to file grievances largely proved unsuccessful. He filed BP-8 and BP-9 forms raising grievances about the release of his medical records but did not receive a response within two years. When he asked his counselor for another BP-8 form to file a grievance about receiving his mail, his counselor allegedly slammed the desk, in an attempt to scare Montalban, and

ordered him to leave.  He evidently forwarded the BP-8 and BP-9 forms to the associate warden after not receiving a reply from his unit team.

Montalban continued filing grievances throughout 2015 and 2016—most of which apparently resulted in responses.  He filed a BP-8 form on October 14, 2015, requesting a copy of his detention order, to which a Coleman staff member responded by informing him that a copy could not be located.  He similarly received responses to BP-8 forms filed on October 22 and November 4, concerning his lost property.  BP-9 forms filed on October 23 and November 2, also concerning his lost property, were rejected shortly after being filed.  The October 23 BP-9 had apparently improperly raised more than one issue and needed to be resubmitted.  The November 2 BP-9 forms were apparently untimely because they concerned an incident that occurred more than a year prior.

Montalban filed BP-10 forms on January 4, 2016, directed to the Bureau's Northeast and Southeast Regional Offices, that requested remedies for his property loss, medical injuries, and mistreatment by the staff.  The Northeast Regional Office acknowledged receipt of his BP-10 form on January 26, and rejected two of his forms on January 22 because they did not raise sensitive issues and were filed in the incorrect region.  Another form was rejected on July 12, 2016, denying him relief.  He filed BP-11 forms on April 15 with the Central Office, requesting the

4

same relief that he had previously sought from the Northeast and Southeast Regional Offices.

He filed a BP-8 form on May 5 with Coleman, requesting a different prescription for his collarbone injury, which was denied by the staff, who informed him that he needed to try his current prescription before receiving a different one. He filed subsequent BP-8 and BP-9 forms on June 10 requesting the status of BP-10 forms he had previously filed in the Northeast and Southeast Regional Offices and to the BP-11 form he filed with the Central Office. These forms alleged that Montalban's counselor showed him letters from the Bureau's Offices responsive to his forms, but refused to give the letters to him. The associate warden at Coleman responded to the BP-9 form, alleging that the BP-10 and BP-11 forms were not "legal mail" and that Montalban had refused to accept them when delivery was attempted.

Montalban filed subsequent forms concerning his financial plan—he filed a BP-8 form on June 13, requesting a copy of his financial plan contract and the address of the deferral district court in Scranton, Pennsylvania, which was provided to him by a Coleman staff member. He filed a BP-9 form on June 20 further outlining his financial plan concerns and referencing the previous BP-8 form.

In June 2016, he filed at least three BP-8 forms concerning other matters and received a response to only one of them from the associate warden on June 16, 2016. He received a response from the warden concerning only one of his BP-9 forms, which dealt with his lost property. Montalban filed his first complaint in the underlying litigation on June 20, 2016. His complaint alleged that the named defendants acted with deliberate and reckless indifference to his medical needs, violated his access to the courts, and deprived him of his liberty and property in violation of the First, Fifth, Sixth, Eighth, and Fourteenth Amendments.

That same day, Montalban was called into his counselor's office. There, he learned that his counselor had confiscated and held his legal documents and mail from two of the Bureau of Prisons' regional offices in an attempt to cause Montalban's case to be dismissed. He requested an additional BP-8 form from his counselor on July 20, and his counselor refused to provide him with the form and told him to stop filing grievances because he would never get them back. He filed his final BP-8 form on November 4, 2016, requesting a copy of one of his medical reports from April 28, 2011, which was responded to by a Coleman staff member with the reports attached.

The government moved to dismiss Montalban's complaint on August 7, 2017, and alternatively sought summary judgment on Montalban's allegations. The district court granted the government's motion to dismiss on January 9, 2018.

6

In its order, the district court exclusively cited the government's version of facts, relying heavily on the affidavit of Caixa Santos, a paralegal specialist at Coleman. It ultimately concluded that "the record shows that Plaintiff failed to exhaust his administrative remedies." With regard to availability, it similarly rejected Montalban's argument that the administrative procedures were functionally unavailable to him. It apparently assumed, *arguendo*, that Montalban was "threatened," but concluded that "there is nothing to show that he was actually prohibited from pursuing his administrative remedies." It rejected Montalban's argument that the Bureau "failed to somehow follow its own procedures," determining that the Bureau responded to each of his grievances and appeals, which were all deficient. "The record is clear," it concluded, "that it was Plaintiff and not the prison officials who failed to follow procedure."

## II. LEGAL ANALYSIS

### A. Standard of Review

We review *de novo* a district court's interpretation and application of the exhaustion requirement under 42 U.S.C. § 1997e(a). *Johnson v. Meadows*, 418 F.3d 1152, 1155 (11th Cir. 2005). To the extent that the district court makes specific factual findings, we review those findings for clear error, but otherwise accept as true the facts set forth in the complaint and draw all reasonable inferences in the plaintiff's favor. *Whatley v. Warden, Ware State Prison*, 802

F.3d 1205, 1209 (11th Cir. 2015) (quotation omitted).  The burden is on the

defendants to prove that the plaintiff failed to exhaust his available administrative

remedies.  *Turner*, 541 F.3d at 1082.

## B. Administrative Procedures

Section 1997e(a) provides that "[n]o action shall be brought with respect to

prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

The exhaustion requirement "applies to all inmate suits about prison life, whether

they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong."  *Johnson*, 418 F.3d at 1155 (quotation

omitted).  Further, the exhaustion requirement is mandatory, foreclosing judicial

discretion and preventing courts from excusing a failure to exhaust.  *Ross v. Blake*,

136 S. Ct. 1850, 1856–57 (2016).

As we have recognized previously, the applicable administrative procedures

for an inmate seeking to "redress the deprivation of any right to which he is

entitled or to which he believes he is entitled" involves a "three-tiered process."

*Irwin v. Hawk*, 40 F.3d 347, 349 n.2 (11th Cir. 1994).  First, the inmate must

"present an issue of concern informally to staff, and staff shall attempt to

informally resolve the issue."  28 C.F.R. § 542.13(a).  Should this prove

8

unsuccessful, he may proceed to the second step and submit a formal, written administrative remedy request on a BP-9 form within 20 days after the basis for the request occurred.[2]  *Id.* §§ 542.13(a), 542.14(a).  Third, and finally, if the inmate is dissatisfied with the warden's response to his request, he can file an appeal on a BP-10 form to the appropriate Regional Director within 20 days.  *Id.* § 542.15(a). If dissatisfied with the Regional Director's response, he can file an appeal on a BP-11 form to the General Counsel within 30 days.

The exhaustion requirement is waived, however, for those grievance procedures that are "unavailable" such that they are not "capable of use to obtain some relief for the action complained of."  *Blake*, 136 S. Ct. at 1858–59 (quotation omitted).  The Supreme Court has identified at least three scenarios "in which an administrative remedy, though officially on the books, is not capable of use to obtain relief": (1) where officers are "unable or consistently unwilling to provide any relief to aggrieved inmates," such that the remedy operates as "a simple dead end"; (2) where the remedy is essentially "unknowable" such that no ordinary

---

[2] An inmate is entitled to an extension of time if he can demonstrate a valid reason for delay, including:

> an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

*Id.* § 542.14(b).

prisoner can understand what it requires; and (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1859–60 (quotation omitted). Additionally, we have determined that a prison official's "serious threats of substantial retaliation" against an inmate for making or pursuing an administrative remedy makes that remedy "unavailable" and lifts the exhaustion requirement if:

> (1) the threat actually did deter the plaintiff inmate from lodging a grievance or pursuing a particular part of the process; and (2) the threat is one that would deter a reasonable inmate of ordinary firmness and fortitude from lodging a grievance or pursuing the part of the grievance process that the inmate failed to exhaust.

*Turner*, 541 F.3d at 1085.

Exhaustion is properly decided on a Rule 12(b) motion to dismiss. *Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008). On a motion to dismiss for failure to exhaust, the district court may consider facts outside of the pleadings and "resolve factual disputes so long as the factual disputes do not decide the merits and the parties have sufficient opportunity to develop a record." *Id.* at 1376. Further, we have established a two-step process to employ in analyzing a motion to dismiss for failure to exhaust administrative remedies. *Turner*, 541 F.3d at 1082. First, the court analyzes the factual allegations in the defendant's motion to dismiss and the plaintiff's response, taking the plaintiff's version of the facts as true if there is a conflict between them, and determines whether the plaintiff's complaint should be

10

dismissed in light of those facts. *Id.* Second, if the complaint is not subject to dismissal at that stage, the court must "make specific findings in order to resolve the disputed factual issues related to exhaustion." *Id.* After resolving the disputed facts, the district court may then decide whether the prisoner has exhausted his available administrative remedies under its findings. *Id.* at 1083.

In *Whatley*, the plaintiff appealed the dismissal of his Section 1983 claim for failure to exhaust his administrative remedies. 802 F.3d at 1208. We determined that the district court did not undertake the first *Turner* step because it did not accept the plaintiff's facts as true and ask whether, given those facts, he had exhausted his administrative remedies. *Id.* at 1211. We further determined that the district court did not proceed to the second *Turner* step and identify particular factual disputes, make specific factual findings to resolve those disputes, and decide whether the plaintiff exhausted the administrative remedies. *Id.* We explained that we would review the results of the first step *de novo*, while we would review the fact findings of the second step for clear error, but that it was unclear whether the district court dismissed the case on the first step or the second step. *Id.* at 1213. With, at best, only implicit findings of fact, we determined that we could not review the district court's conclusions. *Id.* Accordingly, we vacated and remanded so that the district court could "properly undertake the two-step *Turner* process." *Id.*

11

### C. *Turner* Analysis

Here, we conclude that the district court did not comply with our holding in *Turner*. At the first *Turner* step, it failed to accept Montalban's facts as true—and then decide whether, under those facts, he exhausted his administrative remedies. And at the second step, it did not identify and resolve all relevant factual disputes between the parties. We address each in turn.

First, the district court failed to comply with the first step of the *Turner* analysis because it did not accept Montalban's allegations as true and decide whether, under those facts, he exhausted his administrative remedies. Rather, without identifying Montalban's relevant conflicting allegations, the district court seems to have simply accepted the government's version of the facts as true.

Second, the district court did not fully comply with *Turner*'s second step. It did not identify and make explicit findings of fact resolving crucial factual issues. For example, the district court did not address Montalban's allegation that he was threatened to stop pursuing all administrative remedies, that he was told that he would not be receiving responses to his grievances, and that Coleman staff often refused to provide him with the required forms. And, the district court did not address the extent to which such allegations, if true, would deter him from effectively presenting his relevant grievance claims to the responsible officials.

12

In light of these circumstances, and our decisions in *Turner* and *Whatley*, we are unable to adequately review the decision of the district court. *Whatley*, 802 F.3d at 1213.

### III. CONCLUSION

We determine that the district court failed to undertake the first step of the *Turner* process because it did not accept Montalban's facts as true and decide whether, under those facts, he exhausted his administrative remedies. The district court also failed to complete the second step of the *Turner* process because it did not identify and resolve the relevant factual disputes between the parties. Accordingly, we vacate the district court's order and remand the case to the district court so that it can properly undertake the two-step *Turner* process.

**VACATED and REMANDED.**