In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-3298

DARWIN RAMIREZ,

*Plaintiff-Appellant,*

*v.*

RICHARD YOUNG, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 13-3362 — **Colin S. Bruce**, *Judge.*

ARGUED APRIL 4, 2018 — DECIDED OCTOBER 9, 2018

Before WOOD, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. Under the Prison Litigation Reform Act of 1995 (PLRA), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner … until such administrative remedies *as are available* are exhausted." 42 U.S.C. § 1997e(a) (emphasis

added). This appeal concerns the availability of administrative remedies described to a prisoner by prison officials only in a language they knew he could not understand. We hold that this was not enough to render those remedies "available" to the prisoner. We therefore reverse the judgment dismissing Darwin Ramirez's federal suit for failure to exhaust and remand for further proceedings.

**I**

Ramirez, who is a Spanish speaker, sued administrators and officers of the Western Illinois Correctional Center under 42 U.S.C. § 1983 for alleged constitutional wrongs. He was in prison at the time he filed his action, and so it was subject to the PLRA's exhaustion requirement. See 42 U.S.C. § 1997e(a).

Western Illinois indisputably had administrative remedies available for prisoners' use. Ramirez did not use those procedures in a timely fashion to complain about the issues raised in his federal action, and so the defendants moved for summary judgment based on Ramirez's failure to exhaust. Ramirez responded that Western Illinois's existing grievance process was unavailable to him and he was thus excused from the PLRA's exhaustion requirement. See *id.*; *Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016). The district court held an evidentiary hearing on the availability question as required by *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008), after which it dismissed Ramirez's complaint without prejudice. It concluded that remedies are unavailable under the PLRA only under certain exclusive circumstances: if prison officials fail to respond to properly filed grievances; if prison officials affirmatively prevent exhaustion through misconduct; or if compliance with the grievance process is impossible. None of those applies to Ramirez.

Ramirez has now appealed from the order dismissing his action. Ordinarily, the fact that the district court's dismissal was without prejudice would bar an appeal on grounds of lack of finality, but that is not the case here. Ramirez is no longer in custody, and so he cannot remedy his failure to exhaust. The dismissal was thus effectively a final order, and we may proceed with the appeal. See *Kaba v. Stepp*, 458 F.3d 678, 680 (7th Cir. 2006).

If, as in this case, a prisoner's complaint is dismissed after a *Pavey* hearing for failure to exhaust, we review factual findings for clear error and legal decisions *de novo*. *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018). Failure to exhaust is an affirmative defense for which the defendants carry the burden of proof. *Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016). All remaining factual disputes must be construed in Ramirez's favor at this juncture. *Id.* To meet their burden, the defendants must show beyond dispute that remedies were available. *Id.*

The record shows that Ramirez was arrested in 2007 and taken initially to the Cook County jail. While there, he was attacked. He notified a sergeant, who moved Ramirez to protective custody. After eight months at Cook County jail, Ramirez was transferred to Western Illinois, a state prison. After his transfer, Ramirez attended a new-prisoners orientation. This English-only orientation introduces prisoners to Western Illinois's internal grievance procedures. Ramirez, however, did not understand English, a fact that he disclosed to a prisoner working at the orientation. That prisoner started translating the orientation into Spanish for Ramirez. Yet the

administrator conducting the orientation ordered the prisoner to stop doing so. The translator had not explained the grievance process to Ramirez prior to being silenced.

Western Illinois maintained a cumulative counseling summary for Ramirez—a running log of each interaction between him and the prison staff. An entry from the day of orientation noted that Ramirez had "poor English skills" and that Ramirez had received an orientation manual, which contained information about Western Illinois's grievance mechanisms. The counseling summary reflected that Ramirez received a Spanish-language copy of the manual, but he insists that it was actually in English. Because the district court did not resolve this dispute in the *Pavey* hearing, we accept Ramirez's account for present purposes. And we note that Western Illinois was asked during these proceedings to produce a Spanish-language manual that pre-dates 2011, but it was unable to do so. Its failure corroborates Ramirez's account. When orientation ended, Ramirez signed a form confirming that he had completed orientation and received the manual. That form also was in English.

The prison asserts that it referred people identified during orientation as non-English speakers to someone who would conduct orientation in the prisoner's preferred language. Julia Vincent, a correctional counselor at Western Illinois, was the facility's only Spanish-speaking employee; she ordinarily helped with orientation for Spanish speakers. But Ramirez alleges that his case was different. He and Vincent met the day after orientation; they spoke exclusively in Spanish. That meeting covered Ramirez's immigration status but not the content of Western Illinois's orientation or the manual.

Ramirez finished orientation in the dark about the prison's grievance process.

The evidence strongly suggests that Western Illinois's staff knew that Ramirez did not understand English. Each time Ramirez visited a doctor Vincent would translate or, if she was unavailable, Ramirez communicated through body signals. At his meetings with the mental health staff, Ramirez specifically requested a translator. And Ramirez separately met with Vincent more than ten times before filing his federal complaint. Ramirez testified that those meetings were conducted in Spanish, and again, there was no evidence to the contrary at the *Pavey* hearing.

Vincent had reason to suspect that Ramirez was ignorant of the prison's grievance process. In 2011, Ramirez's cellmate threatened him with a shank. Ramirez tried to tell a correctional officer about the incident, but the language barrier prevented him from describing what had occurred. As a result, the officer directed Ramirez to return to his cell. When Ramirez refused to do so, he was placed in segregation. A disciplinary hearing followed. Ramirez explained to Vincent, his translator at the hearing, that he had refused to comply because he feared living with a cellmate who had threatened him with a shank. Despite the troublesome implications of Ramirez's story, Vincent did not ask why he had not filed a grievance or if he wanted to do so. Nor did she advise him that the prison had a system in place that he might use to pursue a complaint about the threats or the move to segregation.

While imprisoned, Ramirez did pick up tidbits about Western Illinois's internal operations. For example, with the help of a fellow prisoner he discovered how to seek dental care. But Ramirez never saw another prisoner file a grievance

and did not know about the possibility of filing complaints against prison staff. English-language grievance forms were distributed throughout the prison's common areas, but they were useless to Ramirez: as late as 2015 Ramirez could speak a little English but could not read in the language. Vincent insists that Spanish-language forms also were available, but Ramirez and other prisoners dispute that. Again, this dispute must be resolved in Ramirez's favor.

No one from Western Illinois ever informed Ramirez in Spanish that there was a grievance process. He first learned of it in the summer of 2013, several months before filing his complaint in this action, after confiding in his cellmate about troubles he was enduring. Ramirez's cellmate suggested that he file a grievance. Because Ramirez's response conveyed confusion, the cellmate outlined how grievances function. Since that time, Ramirez has filed a number of grievances with substantial assistance. The record does not reveal whether any of those grievances related to the issues in his federal complaint.

## II

### A

Administrative remedies are available for purposes of the PLRA's exhaustion requirement if they are "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Two principles inform whether Western Illinois's administrative remedies were available to Ramirez. First, remedies are available only if a prisoner has been notified of their existence. *Hernandez*, 814 F.3d at 842; *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015). Prisoners are not expected "'to divine the availability' of grievance procedures." *Hernandez*, 814 F.3d

at 842 (quoting *King*, 781 F.3d at 896). Second, existing reme-
dial processes are available only if communicated in a way
reasonably likely to be understood. *Roberts v. Neal*, 745 F.3d
232, 235 (7th Cir. 2014). Before dismissing a prisoner's com-
plaint for failure to exhaust, the district court should be able
to point to evidence that the relevant administrative proce-
dures were explained "in terms intelligible to lay persons." *Id*.
That analysis must also account for individual capabilities. *Cf.*
*Weiss v. Barribeau*, 853 F.3d 873, 875 (7th Cir. 2017) (excusing
failure to exhaust where defendants failed to show that exist-
ing procedures could be used by prisoner suffering from men-
tal illness).

Western Illinois disclosed its grievance process to Ramirez
through its orientation and manual. Yet both were in English,
and it should have been apparent to prison officials that
Ramirez's English-language skills were so limited that he
could not comprehend either the oral or the written materials.
As we noted earlier, Ramirez's inability to understand Eng-
lish was documented in the opening entry of the counseling
summary. At orientation the instructor silenced the prisoner
translating for Ramirez. Vincent met with Ramirez the next
day, and the pair spoke exclusively in Spanish. Every time
Ramirez sought medical treatment he requested a translator
or communicated through signs. And no one at Western Illi-
nois ever remedied the failure to communicate the grievance
process to Ramirez despite widely shared knowledge of his
lack of English proficiency. At a minimum, Vincent should
have tried to acquaint Ramirez with the available procedures
when it became evident during the 2011 disciplinary hearing
that Ramirez was unaware of them.

The defendants have not taken the extreme position that they are entitled in all cases to provide information only in English, no matter whether a single word gets through to the non-English-speaking recipient. But it is worth asking whether that would be permissible. English is the predominant language in the United States, after all, and governments at all levels often use only English, or perhaps English plus one or two other languages. But "often" is not "always": in some situations, too much is at stake to ignore linguistic differences. Two general scenarios illustrate this point: first, when a government places a person into a criminal or quasi-criminal proceeding; and second, where some other right weighty enough to trigger due-process protections is at stake.

The criminal situation presents an easy case. In *United States v. Cirrincione,* 780 F.2d 620 (7th Cir. 1985), we had this to say about language barriers:

> We hold that a defendant in a criminal proceeding is denied due process when: (1) what is told him is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained to him in a manner designed to insure his full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the district court fails to review the evidence and make appropriate findings of fact.

*Id.* at 634; accord, *Mendoza v. United States,* 755 F.3d 821, 827 (7th Cir. 2014) ("A criminal defendant is denied due process when he is unable to understand the proceedings due to

a language difficulty."); see also 28 U.S.C. § 1827 (implementing that due-process right in federal courts).

This due-process right is not limited to pure criminal proceedings. Both state and federal courts have held that interpreters may be necessary to protect a defendant's due-process rights in other proceedings where important rights are at stake. Due process must be observed in immigration proceedings, for instance, even though they are not criminal. See *Bridges v. Wixon*, 326 U.S. 135, 152 (1945). The same principle has been applied in other settings. See, *e.g.*, *Figueroa v. Doherty*, 303 Ill. App. 3d 46, 51–53 (1999) (truncated interpretation deprived claimant of his right to a fair hearing in proceeding for unemployment benefits); *Golden Egg Club, Inc. v. Illinois Liquor Control Comm'n*, 124 Ill. App. 2d 241, 245 (1970) (interpreter necessary to effectuate due process when revoking a liquor license). As the Supreme Court put it in *Mathews v. Eldridge*, 424 U.S. 319 (1976), "[t]he essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" *Id.* at 348–49 (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171–72 (1951) (Frankfurter, J., concurring)). Notice must, at a minimum, alert a reasonable recipient to the fact that further inquiry is necessary. See *Nazarova v. I.N.S.*, 171 F.3d 478, 483 (7th Cir. 1999). It is ineffective if it is delivered in a language that is incomprehensible to the recipient.

The Second Circuit has drawn a line between proceedings that establish a benefit and proceedings to impose a deprivation, for purposes of the right to an interpreter. *Abdullah v. I.N.S.*, 184 F.3d 158 (2d Cir. 1999). There the court rejected a claim that applicants for admission to the United States as Special Agricultural Workers had a due process right to an

interpreter, because they were seeking a benefit. *Id.* at 165–66. It contrasted their position to that of an accused defendant or an alien claiming a risk of political persecution abroad, both of whom have a constitutional right to be provided with the services of an interpreter. *Id.* at 164–65.

The remaining question before us is how these principles apply in prison disciplinary proceedings. To the extent it matters, Ramirez was trying to complain about deliberate indifference to his medical needs and the risk of harm from other prisoners. This easily falls on the "deprivation" side of the Second Circuit's line. We can thus turn immediately to the question whether his suit should be barred by his failure to file timely grievances.

No prison is forced to have a grievance procedure. If it thinks that the costs of such a procedure outweigh the benefits, it can do without. In such a case, the question of a right to an interpreter never arises. But most prisons and jails, including Western Illinois, do offer a grievance process, and they expect prisoners to use it in accordance with its terms. Congress has strongly backed up the prisons in this respect. A state prisoner who wishes to bring a civil rights action—perhaps for inadequate medical care, or sub-human prison conditions, or excessive force on a guard's part—cannot do so unless he has exhausted his administrative remedies within the prison. See *Woodford v. Ngo*, 548 U.S. 81 (2006) (prisoner does not exhaust by filing a procedurally defective grievance); *Porter v. Nussle*, 534 U.S. 516, 520 (2002) (exhaustion required for "all prisoners seeking redress for prison circumstances or occurrences"); *Booth*, 532 U.S. 731 (exhaustion required even when intra-prison grievance procedure cannot offer remedy that prisoner seeks).

Access to the grievance procedure is thus the key to a prisoner's ability to seek redress for constitutional violations occurring within the prison. Prisoners are entitled to due process in those proceedings, even though the amount of process that is "due" is influenced by the prison context. *Wolff v. McDonnell*, 418 U.S. 539 (1974); see also *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (reversing dismissal of prisoner's complaint alleging due-process violations). But the Supreme Court has never said that prisoners are not entitled to basic notice of charges against them and an opportunity to be heard. Notice may come in either oral or written form. But if every form of notice is in a language one does not speak or read, no notice at all has been conveyed.

That describes Ramirez's situation. This is not a case such as *Nazarova*, in which the Russian-speaking petitioner realized that something important was afoot because she had an English-language letter from which she could decipher a hearing date. 171 F.3d at 483–84. Accepting Ramirez's allegations in the pleadings and the court's factual findings at the *Pavey* hearing, as we must, this record shows that nothing gave him even a clue about the grievance process. Ramirez did not speak English, and the prison itself prevented a friendly fellow prisoner from quietly translating the prison orientation for him. After that, the one Spanish-speaking employee at the prison never told Ramirez how to use the grievance process or even that the grievance process existed. And Ramirez's language barrier was not a secret to the prison. The prison officials knew—and recorded their awareness—of his inability to understand spoken or written English. On this record, we cannot conclude that remedies were available to him.

The defendants' assorted responses fall flat. Even if Ramirez might have elicited information about the grievance procedure from Vincent had he asked, it was not his burden to do so. What would have tipped him off to ask that particular question, as opposed to a hundred others? The PLRA "does not invite prison and jail staff to pose guessing games for prisoners." *Hill v. Snyder*, 817 F.3d 1037, 1040 (7th Cir. 2016). Prisons must affirmatively provide the information needed to file a grievance. If it were otherwise a prison could "shroud the prisoner in a veil of ignorance and then hide behind a failure to exhaust defense to avoid liability." *Hernandez*, 814 F.3d at 842. The defendants argue that Ramirez's experience in Cook County jail, where a complaint about an attack led to protective custody, should have alerted him to the fact that Western Illinois would have a similar grievance process. Setting aside that Cook County jail and Western Illinois are different facilities operated by different governments, the record suggests that Ramirez did learn from his earlier experience: he took the same step at Western Illinois as he had at the Cook County jail. He divulged to Vincent during the disciplinary proceeding that he had been placed in segregation for refusing to share a cell with a dangerous cellmate. But unlike the Cook County sergeant, she never mentioned the grievance process or its possible utility to Ramirez.

Contrary to the defendants' assertions, ruling for Ramirez here is not inconsistent with anything the Supreme Court has said. In *Ross*, the Court offered three examples of situations in which a finding of unavailability would be proper: (1) prison officials are "consistently unwilling to provide any relief to aggrieved inmates"; (2) the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; or (3) prison administrators take affirmative action to

thwart use of the grievance process. 136 S. Ct. at 1859–60. But these were only examples, not a closed list, and to the extent the district court thought they were the latter, it erred. See *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017).

Moreover, we are not holding that a prisoner's subjective unawareness of a grievance procedure excuses his non-compliance. See *Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000). The PLRA does not excuse a failure to exhaust based on a prisoner's ignorance of administrative remedies, so long as the prison has taken reasonable steps to inform the inmates about the required procedures. *Id.* The problem here is that the prison did not take the required reasonable steps.

It does not follow from Ramirez's discovery that he would be able to obtain dental treatment that he should also have intuited the existence of the grievance process. A prisoner easily might learn that an institution provides medical care without concluding that it willingly receives complaints about prison conditions. Running a medical/dental clinic and offering a grievance procedure are two entirely different enterprises. *Cf. Kaba*, 458 F.3d at 685 (recognizing that administrative remedies might be available for only certain issues).

Our decision does not force prisons to choose between keeping numerous translators on retainer and conceding liability in all prison litigation. No such choice faced Western Illinois, because like many such institutions, it had a Spanish-speaker on its permanent staff and it immediately noted that Ramirez's English was poor. If Western Illinois had made the same assessment of another prisoner's English ability, but then realized that the prisoner spoke a less common language, it would need to decide whether to use telephone resources for translation (if its budget would permit this option) or just

to keep the prisoner in the dark about the grievance procedure. If it chose the latter option, it would save money on interpreters, at the potential cost of forfeiting an exhaustion defense should litigation arise. Naturally, it would still be free to raise any other arguments that were available to it in any subsequent litigation.

B

In the alternative, the defendants argue that even if the grievance process was unavailable to Ramirez when he was transferred to Western Illinois, it became available when he learned about it in the summer of 2013. They suggest that Ramirez could have exhausted remedies before filing his October 2013 suit.

Prisons normally insist that grievances must be filed within a certain time and with a certain person. Western Illinois's system is no exception. Ramirez had 60 days from the incidents about which he now complains to file a grievance. ILL. ADMIN. CODE tit. 20, § 504.810(a) (2013), *amended at* 41 Ill. Reg. 3869 (effective Apr. 1, 2017). It is unclear from Ramirez's federal complaint when the alleged wrongs started. The parties have agreed that a grievance filed in 2013 would have been untimely. Maybe so, but maybe not. Ramirez's complaint alleged wrongs that continued at least until he filed his federal complaint. The district court ruled that the ongoing nature of Ramirez's allegations meant that he could have exhausted administrative remedies by filing a grievance in 2013. *Cf. Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) ("In order to exhaust their remedies, prisoners need not file multiple, successive grievances … if the objectionable condition is continuing."). But many people assert that problems are ongoing, when the issue really stems from a discrete act that starts the

clock running. The parties may thus be correct in their assessment of Ramirez's grievance. In addition, that is not the argument defendants have advanced.

Instead, they now reason that in 2013 Ramirez could have taken advantage of language in Illinois's regulation that allows a prison to consider an *untimely* grievance "if an offender can demonstrate that a grievance was not timely filed for good cause." ILL. ADMIN. CODE tit. 20, § 504.810(a) (2013), *amended at* 41 Ill. Reg. 3869 (eff. Apr. 1, 2017). Here the first problem is forfeiture: the defendants did not raise this argument in the district court. The second problem is lack of merit. Prison officials cannot defeat a prisoner's suit after hiding existing remedies by the simple expedient of saying that they would have forgiven the procedural noncompliance and entertained a late grievance. *King*, 781 F.3d at 896. If such a work-around were permissible, prisons could "always defeat prisoner suits by announcing impossible procedural hurdles beforehand and then, when they are sued, explaining that they would have waived the requirements for the plaintiff." *Id.* Accepting the concession that Ramirez needed to initiate the grievance process within 60 days of the start of the defendants' allegedly unconstitutional conduct, remedies were not available to him at a time when he could have filed a timely grievance. He therefore did not need to satisfy the PLRA's exhaustion requirement.

## III

Defendant Cynthia Lynch offers one more basis for dismissing her from the case. At the *Pavey* hearing Ramirez testified that had he filed a grievance against Lynch, who was one of Western Illinois's mental health counselors, it would have

complained of her failure to use a translator when communicating with him. Because the hypothetical grievance would not have related to Ramirez's federal claims, Lynch argues that it does not matter whether remedies were available to Ramirez. Yet the content of a hypothetical grievance is irrelevant to the question of the availability of the process in the first place. The unavailability of the process "lifts the PLRA exhaustion requirement entirely and provides immediate entry into federal court." *Hernandez*, 814 F.3d at 840. The efficacy of a would-be grievance is academic, *id.* at 843, and so Lynch's alternative argument is unavailing.

## IV

Because no administrator or officer of Western Illinois ever informed Ramirez of its grievance process in a way that he might reasonably understand, that process was unavailable to him and he was excused from the PLRA's exhaustion requirement. We therefore REVERSE the district court's judgment dismissing the case and REMAND for further proceedings.