In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-3047
HOWARD SMALLWOOD,
 Plaintiff-Appellant,
 v.

DON WILLIAMS, et al.
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Southern District of Indiana, Indianapolis Division.
 No. 1:20-cv-00404-JPH-DML — James P. Hanlon, Judge.
 ____________________

 ARGUED SEPTEMBER 9, 2022 — DECIDED FEBRUARY 3, 2023
 ____________________

 Before ROVNER, HAMILTON and SCUDDER, Circuit Judges.
 ROVNER, Circuit Judge. Howard Smallwood, an Indiana in-
mate, alleged physical and sexual abuse, excessive force, and
mistreatment at the hands of prison employees and inde-
pendent contractors associated with the Indiana Department
of Correction (IDOC). The district court dismissed his suit on
the defendants’ motion for summary judgment, holding that
Smallwood had failed to exhaust the prison grievance proce-
dures—a necessary prerequisite to filing a lawsuit in federal
2 No. 21-3047

court over prison conditions. Because we find that there are
unresolved, material factual questions regarding Small-
wood’s ability to make use of the grievance procedure, we va-
cate the grant of summary judgment and remand to the dis-
trict court for further proceedings.
 I.
 This case comes to us on a motion for summary judgment,
therefore we recite the facts in the light most favorable to
Smallwood. Gupta v. Melloh, 19 F.4th 990, 997 (7th Cir. 2021).
On October 22, 2017, correctional staff found Smallwood un-
responsive in his cell and brought him to the prison medical
facility where he was given two doses of Narcan as a response
to a presumed overdose. When he awoke and the nurse in-
quired about what drugs he had taken, Smallwood assured
her that he had not taken any, and reminded her that he is
diabetic and had been found similarly unresponsive in his cell
before, and, in that event, an outside hospital treated him for
respiratory distress, not an overdose. Nevertheless, defendant
Dr. Paul Talbot, an employee of Wexford of Indiana, LLC,
with whom IDOC contracts to provide medical care, ordered
a urinalysis to screen Smallwood for illegal drugs. Smallwood
consented to the urinalysis and the results were negative.
 Despite the negative result, Dr. Talbot ordered a blood test
to further screen for drugs. Smallwood asked for a standard
form to refuse the blood draw, reasoning that the urinalysis
was negative, and he had not, in fact, been using drugs. The
prison guards, however, declined to provide him with one,
and informed him that he did not have the option to refuse.
When Smallwood continued to ask for a refusal form, the
prison guards called for backup guards who twisted his
hands and wrists, placed him in a head lock, and held a taser
No. 21-3047 3

to his chest while they placed him in restraints. They then
forced Smallwood into a chair and held him down while a lab
technician drew his blood. The blood test results revealed that
there were no illegal drugs in Smallwood’s system.
 After the forced blood draw, Smallwood alleges that the
officers brought him to an observation cell where they threw
him onto a bed, placed him in a chokehold, pulled his shirt
over his head, and punched him. The officers then pulled
Smallwood’s pants down, placed a knee on his back, and in-
serted a cold object into his rectum. After the assault, the of-
ficers left him naked in the observation cell.
 One hour later, two guards working in the hospital found
Smallwood injured and curled up in the corner of his cell and
called a nurse to assess him. The nurse gave Smallwood aspi-
rin for his pain, ice for the swelling in his neck and wrist, and
submitted a referral for Dr. Talbot to examine him. The next
day, Dr. Talbot gave Smallwood a shot for pain, but ignored
his requests for an X-ray or MRI. Guards then placed Small-
wood in segregation for physically resisting staff members in
the performance of their duties. As a result of this use of force
and sexual abuse, Smallwood alleged that he continues to
have pain and discomfort in his shoulder, wrists, back, and
neck.
 Smallwood filed a grievance about the event, but it is un-
disputed that he did not properly make use of the grievance
procedures outlined in the IDOC Manual of Policy and Pro-
cedures, Offender Grievance Process (Grievance Manual).
The question presented in this appeal is whether that griev-
ance procedure was available to Smallwood.
4 No. 21-3047

 IDOC’s formal grievance process consists of three main
steps, but before a prisoner can begin this formal process, he
must first attempt to informally resolve the problem—a step
we will call “step 0.” On appeal, Smallwood’s newly ap-
pointed counsel points out an exception to the informal reso-
lution requirement—one that had not been acknowledged by
the defendants, or the formerly unrepresented Smallwood
heretofore: a grievant need not make an informal attempt at
resolution before filing a formal grievance when the grievant
alleges sexual abuse. It is unclear whether informal resolution
of a grievance would be required in a mixed situation such as
this one where the prisoner submits one grievance alleging
that he was the victim of excessive force, followed immedi-
ately by a sexual assault, and then inadequate treatment of his
injuries. 1 For our purposes, however, we can leave that ques-
tion for another day. In any event, where informal attempts at
resolution are required but fail, the inmate must file a formal
grievance within ten business days of the incident (step 1). A
grievance specialist screens each submission for compliance
with the requirements of the Grievance Manual, returning
non-compliant grievances with an explanation of the reason
for the rejection, and giving the inmate five days to correct
and re-submit the grievance. Grievances that meet all of the
requirements go to a staff member who must investigate and
respond to the grievance within fifteen business days. If the
inmate is not satisfied with the response or does not receive a

 1 Of course in many cases excessive force, sexual assault, and the en-

suing injuries will be inextricably entwined such that it would not be pos-
sible to separate out each act and engage in informal resolution of some
parts of the grievance and not others. Again we leave this question open
for another day.
No. 21-3047 5

response within twenty business days, he may appeal to the
warden within five business days (step 2). If that response is
also untimely or unsatisfactory, the grievant may appeal to
the ultimate decision maker—IDOC’s grievance manager
(step 3).
 On November 1, 2017, ten days after the forced blood
draw event, Smallwood filed a timely formal grievance which
stated: “I was sexually abused by 5/6 custody officers 10-22-
17 Sunday in the infirmary … I also was forced into taking a
blood test against my will—I was hurt during the process …
wrist, back, neck and hip. I contacted Sgt. Dinkin and Officer
William—Filed a grievance 10-23-17.” R. 59-4 (first ellipsis
added, second ellipsis in original).
 Five days later, the grievance specialist returned Small-
wood’s grievance for failing to show that he had completed
step 0—proof that he had tried to informally resolve his com-
plaint before filing the grievance. The “Return of Grievance
Form” made no mention of the fact that a prisoner is not re-
quired to use an informal grievance process to resolve an al-
leged incident of sexual abuse. The form also instructed
Smallwood that he had five days to either begin the informal
resolution process or return the grievance form with an indi-
cation that he had already attempted to resolve the matter in-
formally. Smallwood did not resubmit the grievance.
 Smallwood made other written complaints about the inci-
dent—in appeals of other grievances or through letter writ-
ing, but none that complied with the steps outlined in the
grievance procedure. And during at least one of his other un-
related grievance attempts, Smallwood expressed frustration
with his ability to understand the grievance process, stating
that he was “incompetent to understanding the procedures.”
6 No. 21-3047

R. 46-2 at 54. And indeed, despite approximately twenty-one
tries, Smallwood has never navigated the IDOC grievance
process to completion.
 On November 5, 2018, about a year after the alleged inci-
dent, Smallwood attempted to informally resolve his griev-
ance by submitting a request-for-interview form regarding
the events of October 22, 2017. The grievance specialist re-
jected it as untimely the same day. Smallwood then pro-
ceeded to file another grievance about the October 2017 inci-
dent, followed by two appeals, all of which were rejected as
untimely.
 Having failed at filing a successful grievance, Smallwood
turned to a writ writer to help him file a complaint in the dis-
trict court. 2 Smallwood brought an action pursuant to 42
U.S.C. § 1983, alleging that the defendants violated his Eighth
and Fourteenth Amendment rights by denying him the right
to refuse medical treatment, sexually abusing him, and using
excessive force against him resulting in serious injuries that
were inadequately treated. 3 The defendants moved for sum-
mary judgment, arguing that Smallwood had not exhausted
his administrative remedies. In response, Smallwood prof-
fered evidence that he has a low IQ and therefore could not
understand the requirements of the grievance procedure. He

 2 In Johnson v. Avery, the Supreme Court upheld the right of inmates

to receive legal assistance from fellow inmates who are sometimes called
“jailhouse lawyers” or “writ writers.” 393 U.S. 483, 490 (1969).
 3 The defendants in this case are IDOC employees Don Williams, Boyd

Lunsford, Cory Conlon, Erick Hammond, and Robert Daugherty, along
with Wexford of Indiana, LLC. the company providing healthcare services
to IDOC, and Dr. Paul Talbot, who, at the relevant times, was an employee
of Wexford.
No. 21-3047 7

noted his difficulties with informal attempts to resolve his
complaint and stated that his placement in restrictive housing
after the incident meant he was unable to have someone assist
him with filing a grievance. The district court determined that
Smallwood did not timely complete the grievance process,
that he did not show at the time he filed his formal grievance
that he had attempted to informally grieve his complaint, and
that there was no evidence in the record that Smallwood was
incapable of following the instructions on the returned griev-
ance form. Consequently, the district court found that Small-
wood failed to exhaust his administrative remedies and
granted the defendants’ summary judgment motion. Small-
wood filed this appeal.
 II.
 Access to the federal courts by prisoners is not automatic.
It is restricted by the prerequisites set forth in the Prison Liti-
gation Reform Act (PLRA), which serve the purpose of giving
prison administrators notice and an opportunity to resolve is-
sues internally before a prisoner turns to the courts. Schillinger
v. Kiley, 954 F.3d 990, 995 (7th Cir. 2020). The PLRA instructs
that “[n]o action shall be brought with respect to prison con-
ditions under section 1983 of this title, or any other Federal
law, by a prisoner confined in any jail, prison, or other correc-
tional facility until such administrative remedies as are avail-
able are exhausted.” 42 U.S.C.A. § 1997e(a). The Supreme
Court has refused to disrupt Congress’ intent by deviating
from this textual mandate requiring exhaustion. Ross v. Blake,
578 U.S. 632, 639–40 (2016). And this court has also made clear
that we require strict compliance with the exhaustion require-
ment. See, e.g., Williams v. Rajoli, 44 F.4th 1041, 1045 (7th Cir.
2022).
8 No. 21-3047

 Nevertheless, despite the strict exhaustion requirements,
the Supreme Court has pointed out that the language of the
PLRA demands that the administrative remedy must be actu-
ally “available” to the prisoner. Ross, 578 U.S. at 642; (citing 42
U.S.C. § 1997e(a)). The Court has defined “available,” as “ca-
pable of use to obtain some relief for the action complained
of.” Id. (internal citations omitted). This availability require-
ment has teeth. “The PLRA exhaustion requirement does not
‘demand the impossible.’ ‘Remedies that are genuinely una-
vailable or nonexistent need not be exhausted.’” Lanaghan v.
Koch, 902 F.3d 683, 688 (7th Cir. 2018) (quoting Pyles v.
Nwaobasi, 829 F.3d 860, 864 (7th Cir. 2016)); see also Ross, 578
U.S. at 642.
 The Supreme Court in Ross set forth several examples of
ways in which a grievance system might be unavailable, in-
cluding if the administrative scheme is “so opaque that it be-
comes, practically speaking, incapable of use.” Ross, 578 U.S.
at 643–44. Consequently, whether a remedy is available to ex-
haust is a fact-specific inquiry. Lanaghan, 902 F.3d at 688.
 That fact-specific inquiry looks generally at whether the
“procedures [were] knowable by an ordinary prisoner in [the
plaintiff’s] situation, or was the system so confusing that no
such inmate could make use of it?” Ross, 578 U.S. at 648. More
specifically, when assessing whether the grievance process
could have been understood by a particular prisoner, the in-
quiry must consider individual capabilities. Ramirez v. Young,
906 F.3d 530, 535 (7th Cir. 2018). And so, for example, a griev-
ance system manual that is written in English and then ex-
plained in English to a Spanish-speaking prisoner with little,
if any, English comprehension, is not a process that is availa-
ble to that prisoner. Id. at 540. Likewise, an inmate with severe
No. 21-3047 9

physical limitations, who could not write on his own and yet
was denied access to a place where he could be assisted by a
fellow inmate in writing a grievance, did not have an admin-
istrative remedy available to him. Lanaghan, 902 F.3d at 689.
Nor was a remedy available to an inmate incapacitated by a
stroke, Hurst v. Hantke, 634 F.3d 409, 412 (7th Cir. 2011), or
serious mental health issues. Weiss v. Barribeau, 853 F.3d 873,
874–75 (7th Cir. 2017) (Fact issues precluded dismissal on
summary judgment where an inmate claimed his ability to file
a grievance was impaired by serious mental health issues and
the accompanying “mind altering psychotropic drugs.”).
Speaking more categorically, we have made clear that a rem-
edy that is available to the majority of inmates may not be
available to those who are illiterate, blind, or whose individ-
ual circumstances otherwise render the procedures unavaila-
ble to them. Lanaghan, 902 F.3d at 688. Indeed, IDOC’s Griev-
ance Manual is in concert with these holdings stating, “[t]he
Warden/designee shall ensure that the offender grievance
process is explained to offenders whose primary language is
other than English, or has a visual, hearing, or mental impair-
ment. There shall be mechanisms in place to ensure that the
offender grievance process is understood by all offenders.”
R. 59-2 at 7.
 Remedies may be unavailable to prisoners for other fact-
specific reasons unrelated to physical health or mental capac-
ity, in particular where the prison acts in a manner that causes
the grievance procedure to be unavailable—for example,
where the process exists in theory but operates as a dead end,
or where prison administrators thwart the use of the process
through “machination, misrepresentation, or intimidation.”
Ross, 578 U.S.at 644. We explore these reasons further below,
but we stress here that a grievance procedure might be
10 No. 21-3047

unavailable even in the absence of affirmative misconduct by
prison officials. Lanaghan, 902 F.3d at 688.
 To be certain, the PLRA does not excuse a failure to ex-
haust based on a prisoner’s ignorance of administrative rem-
edies where a prison has done an adequate job of informing
the prisoner about the grievance procedure. Ramirez, 906 F.3d
at 538. Nor does it excuse noncompliance because of a pris-
oner’s subjective lack of awareness of a grievance procedure,
(Id.) or when he is simply mistaken about the meaning of the
prison’s grievance procedures. Ross, 578 U.S. at 644 (“The pro-
cedures need not be sufficiently ‘plain’ as to preclude any rea-
sonable mistake or debate with respect to their meaning.”).
But when a prisoner’s ignorance of the process is not within
his control—that is, because he has not been informed of the
process, whether due to misconduct by prison employees, or
because his personal circumstances preclude him from being
able to make use of the process, it is not available to him.
 In this case, we are evaluating the availability of the griev-
ance process within the framework of the defendants’ motion
for summary judgment, where, in our de novo review, we
construe the facts in the light most favorable to Smallwood.
McIntosh v. Wexford Health Sources, Inc., 987 F.3d 662, 666 (7th
Cir. 2021); Pyles, 829 F.3d at 864. Moreover, we must bear in
mind that failure to exhaust is an affirmative defense, and as
such the burden of proof is on the defendants to establish that
administrative remedies were not exhausted, and not on the
prisoner to show that administrative remedies were unavail-
able. Gooch v. Young, 24 F.4th 624, 627 (7th Cir. 2022); Lana-
ghan, 902 F.3d at 688; Hernandez v. Dart, 814 F.3d 836, 840 (7th
Cir. 2016).
No. 21-3047 11

 Because summary judgment is appropriate only when
there is no dispute of material fact and the moving party is
entitled to judgment as a matter of law, a grant of summary
judgment in favor of the prison is not appropriate where there
exists a question of material fact regarding whether a pris-
oner’s individual circumstances rendered him unable to ex-
haust the prison grievance system. See Weiss, 853 F.3d at 875
(Dismissal on summary judgment was premature where
there were fact questions regarding the prisoner’s incapacita-
tion due to his mental health hospitalization.); see also Pyles,
829 F.3d at 869 (On summary judgment, the magistrate’s cred-
ibility and factual determinations regarding exhaustion of the
grievance procedures were inappropriate.); Lynch v. Corizon,
Inc., 764 F. App’x 552, 554 (7th Cir. 2019) (nonprecedential de-
cision) (A prisoner’s detailed and specific affidavit attesting
to the fact that prison employees altered his medication thus
leaving him too confused to complete the grievance process
was competent evidence to prevent summary judgment and
warrant an evidentiary hearing.). 4
 In this circuit, we have determined that disputed factual
questions that bear on exhaustion can be resolved by a district

 4 We have included several non-precedential decisions in the opinion

as additional examples of instances in which factual ambiguity regarding
a prisoner’s ability to make use of a grievance system precluded use of the
summary judgment procedure. The fact that many of these cases are re-
solved in non-precedential orders reflects the fact that prisoners often
bring these claims without counsel in cases that do not have fully devel-
oped adversarial records. Although we need not rely on any of these de-
cisions as authority, they do provide helpful illustrations and reminders
of our singular task at summary judgment of determining whether there
are material disputes of facts that require resolution at a Pavey hearing or
trial. See Weiss, 853 F.3d at 875.
12 No. 21-3047

court judge (rather than a jury) as a preliminary matter, in
what is known as a “Pavey hearing.” Pavey v. Conley, 544 F.3d
739, 742 (7th Cir. 2008), as amended on denial of reh’g and reh’g
en banc (Sept. 12, 2008). In short, if there are contested facts as
to whether a prison grievance process was available (keeping
in mind that the burden of proof is on the defendants to show
a lack of exhaustion), summary judgment is not appropriate
and this gateway factual determination must be made in a
Pavey hearing.
 Our inquiry then is whether there were contested facts
material to the question of whether the grievance process was
available to Smallwood. Taking the facts in the light most fa-
vorable to Smallwood, he alleges that he was unable to ex-
haust the grievance process because his low IQ and lack of
access to anyone who might help him made it impossible for
him to understand and make use of the procedures and re-
quirements of the administrative process. As evidence of this,
he points to his school record documenting his IQ as 75, the
fact that he was in restrictive housing and without access to
the assistance of writ writers on whom he usually depended
during the time period in which the grievance had to be filed,
and the fact that, although he had attempted to file twenty-
one grievances between 2005 and 2020, not once had he suc-
cessfully navigated a grievance through to exhaustion.
 The defendants, on their part, allege that Smallwood was
not so impaired, claiming that he demonstrated no evidence
that he was incapable of meeting the requirements of the
grievance process or that prison officials were aware of any
impediment to his understanding of the process. Under the
defendants’ version of events, there is no evidence that any
prison official knew of any reason why Smallwood could not
No. 21-3047 13

understand the grievance process. The defendants also claim
that his isolation in restricted housing did not prevent him
from properly following the grievance procedures. The dis-
trict court agreed, finding that Smallwood failed to attach any
proof that he had tried to informally grieve his complaint, and
that “[a]side from the 40-year-old IQ estimates, there is no ev-
idence in the record that Mr. Smallwood was incapable of fol-
lowing the instructions on the returned grievance.” R. 67 at 7.
To the contrary, the court noted, “[h]is filings in this case have
been coherent and he has responded appropriately to orders
from the Court.” Id.
 The district court, however, was obligated to accept the
plaintiff’s factual averments as true for the limited purposes
of evaluating the motion for summary judgment. Small-
wood’s low IQ score may have been old, but contrary to the
defendants’ claim that he presented no evidence of incapac-
ity, his low IQ score was certainly some amount of evidence
of an inability to understand a dense grievance process. Ac-
cording to the American Association on Intellectual and De-
velopmental Disabilities, an IQ score between 70 and 75 indi-
cates significant limitations in intellectual functioning. 5 A

 5 Am. Assoc. on Intellectual and Developmental Disability, Defining

Criteria for Intellectual Disability, https://www.aaidd.org/intellectual-disa-
bility/definition; see also Am. Psychiatric Ass’n, Diagnostic and Statistical
Manual of Mental Disorders (5th ed., 2013), at 37 (DSM-V). The IQ score was,
indeed, old—dating from his elementary school years, in 1971. Neverthe-
less, Smallwood points to research indicating that IQ remains relatively
stable throughout life. Smallwood Brief at 32, citing Am. Psychiatric Ass’n,
Diagnostic and Statistical Manual of Mental Disorders (4th ed., text revision
2000), at 42; see also DSM-V at 38–39 (“After early childhood, the disorder
is generally lifelong, although severity may change over time.”).
14 No. 21-3047

factfinder might consider the age and source of the IQ score
when deciding how much weight to give that evidence, but
the factfinder could certainly conclude from Smallwood’s al-
legations both that Smallwood had an IQ between 70 and 75,
and that he was unable to understand IDOC’s grievance pro-
cess. After all, the process is described in a fifteen-page, sin-
gle-spaced grievance manual that has multiple cross refer-
ences, and sentences such as the following: “No grievance
shall be rejected because an offender seeks an improper or un-
available remedy, except that a grievance shall be rejected if
the offender seeks a remedy to a matter that is inappropriate
to the offender grievance process.” R. 59-2 at 6. According to
the Brief Amici Curiae of The American Civil Liberties Union
et. al., the grievance policy is ranked “difficult to read” (col-
lege level) by the Flesch Reading Ease Score. See Brief Amici
Curiae of The American Civil Liberties Union et. al. at 7–9 &
n.16 (describing the Flesch Reading Ease evaluation and the
complexity of IDOC’s grievance process, including examples
of minor technical errors that have proven fatal to prisoner
claims). See also Davis v. Moroney, 857 F.3d 748, 752 (7th Cir.
2017) (discussing the Flesch Reading Ease Readability For-
mula and applying it to district court orders as a helpful heu-
ristic to understand if a prisoner with intellectual disabilities

Moreover, on appeal he points to expert testimony from his state court
sentencing in 2001 in which an expert also estimated his IQ to be around
70 to 75. See Smallwood v. State, 773 N.E.2d 259, 262 (Ind. 2002). Smallwood
did not place that evidence in the record in the district court where he was
acting pro se, but because of a general ethos of generosity toward pro se
filings, and the posture in which the case now stands, we simply note that
the more recent state court evidence is corroborative of the older IQ score.
See United States v. Hassebrock, 21 F.4th 494, 498 (7th Cir. 2021) (noting that
the court of appeals construes pro se submissions generously).
No. 21-3047 15

had a fair opportunity to prosecute his case). 6 In fact, as we
explore later, it appears that even the defendants did not un-
derstand the requirements of their own grievance procedure,
having insisted up until this appeal, that Smallwood was re-
quired to informally grieve his sexual assault claim.
 The district court also viewed Smallwood’s “coherent”
and “appropriate” filings in the case before it as evidence of
his ability to file a grievance. R. 67 at 7. In doing so, the district
court overlooked Smallwood’s claims that although he ordi-
narily receives assistance from writ writers and other compe-
tent fellow prisoners in writing grievances and filing court
documents, that assistance was not available to him during
the ten days he had to file a complaint after the October 22,
2017 incident, as he was in restrictive housing and moved
from cell to cell. For example, the complaint and amended
complaint filed in the district court both indicate that they
were prepared by writ writers. See R. 1 at 16, R. 15 at 19. Small-
wood also indicated in an earlier filing asking for an extension
of time in which to file his response to the defendants’ motion
for summary judgment that he
 had to seek out the assistance of a Law Library
 Clerk … to assist him in responding to the Mo-
 tion for Summary Judgment because Small-
 wood does not have the Legal skills to perfect a
 response to the Attorney General’s Motion.
 Smallwood’s I.Q. is about 75 and has disabilities

 6 Flesch readability scores have been available on Microsoft Word for

at least a decade. For further discussion of Flesch Readability scores in le-
gal writing, see Norma Otto Stockmeyer, Using Microsoft Word’s Readabil-
ity Program, Mich. Bar J., Jan. 2009, at 46.
16 No. 21-3047

 with understanding legal terms, researching
 and how to draft out responses in the correct Le-
 gal terms.
R. 61 at 2 (capitalization in original).
 As for the claim that there was no evidence in the record
that the prison knew that Smallwood was unable to make use
of the grievance system, nothing in the text of the PLRA re-
quires that prison officials know that the grievance process is
unavailable. As we have explained, unavailability “does not
include any requirement of culpability on the part of the de-
fendant.” Lanaghan, 902 F.3d at 688. Even if it did, Smallwood
points to evidence both that he could not navigate the griev-
ance system, and that the defendants knew he could not. For
example, on June 7, 2018, (a few months before his second
round of attempts at filing a grievance regarding the under-
lying incident), he filed a grievance about another matter in
which he informed the prison grievance officers, “I am not fa-
miliar with the policy and administrative procedures … be-
cause I am incompetent to understanding [sic] the proce-
dures.” R. 46-2 at 54. Smallwood also notes that the defend-
ants’ own evidence compellingly demonstrated his inability
to navigate the grievance procedure. According to the
prison’s grievance log, despite approximately twenty-one
tries, Smallwood had never navigated the IDOC grievance
process to completion. R. 46-2 at 1–4. In the twenty-one griev-
ances that made it to step one of the process (and thus were
recorded in the log), only one made it to step two. Id. None
made it through all three steps. Id. Moreover, the defendants’
own evidence also contained a record of eighteen attempts in
which Smallwood failed to reach even the first step of filing.
Eight of the grievances were returned because Smallwood
No. 21-3047 17

failed to indicate that he tried to informally resolve the com-
plaint. Id. at 33, 37, 39, 43, 55, 58, 62, 70. Seven were filed too
late; Id. at 41, 43, 45, 48, 50, 64, 66, 68; Two were returned be-
cause he tried to appeal before his grievance was accepted, Id.
at 53, 60, and one was returned because the issue had already
been addressed. Id. at 35. The defendants, not Smallwood,
placed this evidence into the record, but the district court’s job
was to construe the facts in the light most favorable to Small-
wood, and to do so liberally in light of Smallwood’s pro se
status in the district court. See Parker v. Four Seasons Hotels,
Ltd., 845 F.3d 807, 811 (7th Cir. 2017). Sometimes the facts
most favorable to the party opposing summary judgment will
be facts entered into the record by the party moving for sum-
mary judgment. See Gupta, 19 F.4th at 997. A court conducting
a Pavey hearing could certainly find that the defendants’ own
records were evidence that Smallwood could not navigate the
administrative grievance procedures effectively.
 Once Smallwood pointed to sufficient factual allegations
demonstrating a genuine dispute as to whether the adminis-
trative remedies were available to him, the district court was
obligated to conduct a Pavey hearing to resolve the factual dis-
pute. See Roberts v. Neal, 745 F.3d 232, 234 (7th Cir. 2014) (citing
Pavey, 544 F.3d at 741–42) (a district court must resolve con-
tested facts at a Pavey hearing). A court can grant a motion for
summary judgment without holding a Pavey hearing only if,
after taking the facts in the light most favorable to the non-
movant (Smallwood), the court determines that there are no
genuine issues of material fact, and the defendants met their
burden of establishing that the grievance process was availa-
ble to Smallwood as a matter of law. See Celotex Corp. v.
Catrett, 477 U.S. 317, 322 (1986); see also, e.g., Roberts, 745 F.3d
at 234; Kaba v. Stepp, 458 F.3d 678, 686 (7th Cir. 2006)
18 No. 21-3047

(Summary judgment is inappropriate where there are unre-
solved factual disputes as to the availability of the grievance
process.); Gaines v. Prentice, No. 21-1588, 2022 WL 2304227, at
*2 (7th Cir. June 27, 2022) (Where the prisoner’s “declaration
created a genuine dispute whether administrative remedies
were ‘available’ to him, the district court was obligated to con-
duct a Pavey hearing to resolve the dispute.”); Lynch, 764 F.
App’x at 554 (Once the prisoner provided sufficient evidence
to create a question as to whether administrative remedies
were available to him, the court was obligated to conduct an
evidentiary hearing to resolve this fact dispute.); Owens v.
Funk, 760 F. App’x 439, 442 (7th Cir. 2019) (nonprecedential
decision) (Remanding where the district court did not
properly assess the prisoner’s statement about the availability
of the grievance process.); Schaefer v. Bezy, 336 F. App’x 558,
560 (7th Cir. 2009) (nonprecedential decision) (“Because the
prison employees bear the burden on exhaustion, they must
do more than point to a lack of evidence in the record; rather
they must ‘establish affirmatively’ that the evidence is so one-
sided that no reasonable factfinder could find that [the pris-
oner] was prevented from exhausting his administrative rem-
edies.”). We cannot say that, as a matter of law, the defend-
ants met their burden of demonstrating that the grievance
process was available to Smallwood. Smallwood pointed to
evidence sufficient for a factfinder to determine both that he
could not understand or make use of the grievance process.
Additional evidence submitted by the defendants themselves
supports his allegations. The prison nevertheless disputes his
evidence, and thus we have before us a factual dispute that
cannot be resolved at summary judgment and must be re-
solved at a Pavey hearing.
No. 21-3047 19

 It is true, as the defendants argue, that Smallwood did not
have any physical incapacitation that prevented him from fol-
lowing the grievance process, as did the defendants in Lana-
ghan and Pavey. Lanaghan, 902 F.3d at 688–89; Pavey v. Conley,
170 F. App’x 4, 8 (7th Cir. 2006) (nonprecedential decision).
But of course a mental or intellectual impairment can make a
grievance process as unavailable as physical incapacitation.
See Weiss, 853 F.3d at 875 (finding that a factual resolution was
needed to determine whether the grievance procedure was
available to a prisoner with mental health issues.); Lynch, 764
F. App’x at 554 (same). And if we look by analogy to the ADA
context, a prison must accommodate both physical and men-
tal impairments, as defined by the ADA, in the same manner.
See 42 U.S.C. § 12102(1)(A); Penn. Dep’t of Corr. v. Yeskey, 524
U.S. 206, 210 (1998) (applying ADA to prisons). See also Hamm
v. Reeves, 142 S. Ct. 743, 743–44 (2022) (Kagan, J., dissenting)
(noting that it is a violation of the ADA to deny a prisoner
with a cognitive disability access to a prison process.)
 Because we remand for the district court to conduct a
Pavey hearing to resolve the factual dispute, we need not
make any separate determinations about exhaustion of the
sexual assault claims, as the district court can consider this
matter on remand. It is worth noting, however, a few things
about Smallwood’s sexual assault claim.
 First, the prison administration has defended this lawsuit
by arguing that Smallwood failed to exhaust all of his claims
through the prison grievance system, including by failing to
informally resolve his concerns at what we have called step 0,
and by arguing that the statute of limitations for all of his
claims had passed. See State Defendants’ Memorandum in
Support of their Motion for Summary Judgment as to Issue of
20 No. 21-3047

Exhaustion, R. 58 at 3, 4, 7, 8, 9–12. According to the Grievance
Manual, however, there is no requirement to informally re-
solve a sexual assault claim before filing a grievance. Griev-
ance Manual, R. 59-2 at 5 (“The Department shall not require
an offender to use any informal grievance process, or to oth-
erwise attempt to resolve with staff, an alleged incident of sex-
ual abuse.”). In addition, the Grievance Manual “remov[es]
the standard time limits on submission for a grievance regard-
ing an allegation of sexual abuse.” Id. 7 Because these are
IDOC’s own rules we can assume that they were known to
the defendants both at the time Smallwood filed his grievance
and during the time the state defendants were defending the
suit in the district court. It was not until this appeal, when
Smallwood received appointed counsel, however, that Small-
wood’s counsel brought to the attention of this court the fact
that the prison had erroneously required Smallwood to com-
ply with this requirement.
 It is no wonder that Smallwood did not raise this issue
while in prison or raise the issue in the district court. The
prison administrators themselves told him just the opposite—
first, that they would not entertain his grievance as he failed

 7 These same exceptions appear in the regulations implementing the

Prison Rape Elimination Act, 34 U.S.C. § 30301 et. seq. See 28 C.F.R.
§ 115.52(b)(3) (“The agency shall not require an inmate to use any informal
grievance process, or to otherwise attempt to resolve with staff, an alleged
incident of sexual abuse.”); 28 C.F.R. § 115.52(b)(1) (“The agency shall not
impose a time limit on when an inmate may submit a grievance regarding
an allegation of sexual abuse.”). State corrections facilities are not required
to adopt the federal PREA, see J.K.J. v. Polk Cnty., 960 F.3d 367, 384 (7th Cir.
2020), cert. denied sub nom. Polk Cnty., v. J.K.J., 141 S. Ct. 1125 (2021), but
IDOC’s grievance manual mirrors PREA on at least these two require-
ments.
No. 21-3047 21

to attempt to informally resolve the matter, and then, a second
time, because he filed the grievance too late. R. 59-5, & 59-7;
see also State Defendants’ Memorandum in Support of their
Motion for Summary Judgment as to the Issue of Exhaustion,
R. 58 at 3, 4, 7, 8, 9–12. And as we noted above, the Supreme
Court instructs that administrative remedies are not available
where, although a process exists, officers are unable or un-
willing to provide any relief, or prison administrators “thwart
inmates from taking advantage of a grievance process
through machination, misrepresentation, or intimidation.”
Ross, 578 U.S. at 644. See, e.g., Kaba, 458 F.3d at 686 (noting that
the grievance procedure would not be available if prison per-
sonnel denied the prisoner forms, intimidated him into not
pursuing formal grievances, and solicited other inmates to at-
tack him in retaliation for filing grievances). Ebmeyer v. Brock,
11 F.4th 537, 542–43 (7th Cir. 2021) (Remedies are considered
unavailable when a correctional officer tells the prisoner that
he cannot file a grievance when, in fact, he can.); Thomas v.
Reese, 787 F.3d 845, 847–48 (7th Cir. 2015) (same); Swisher v.
Porter Cnty. Sheriff’s Dep’t, 769 F.3d 553, 555 (7th Cir. 2014) (A
prisoner need not exhaust a grievance procedure where the
warden told the prisoner not to file a grievance because the
prison would resolve the issue informally and then refused to
issue a blank grievance form.); Curtis v. Timberlake, 436 F.3d
709, 712 (7th Cir. 2005) (When “prison officials encourage, or
even invite, noncompliance with written procedure,” they
cannot then assert that a prisoner has failed to properly ex-
haust that procedure.). The prison officials’ misinformation
thus thwarted Smallwood from resolution of his sexual as-
sault complaint both in prison and in the district court.
 Finally, in addition to the sexual assault statute of limita-
tions question, there is a broader time limit issue. Along with
22 No. 21-3047

their exhaustion argument, the defendants argue, in the alter-
native, that Smallwood filed his lawsuit after the statute of
limitations had run. The district court ordered briefing only
as to the exhaustion claim, stayed all other proceedings, and
then decided the case only on the issue of exhaustion without
addressing the statute of limitations. R. 43 at 2, R. 67 at 1, n.1.
We will not consider the statute of limitations issue before the
district court has had an opportunity to address it first on re-
mand. See, e.g., Bourke v. United States, 25 F.4th 486, 490 (7th
Cir. 2022) (declining to address the statute of limitations ques-
tion which had not been considered by the district court in the
first instance).
 We VACATE the decision of the district court and
REMAND for further proceedings consistent with this opin-
ion.
No. 21-3047 23

 SCUDDER, Circuit Judge, concurring in the judgment. I agree
with the majority’s bottom-line determination to remand the
case to the district court for a hearing to determine whether
the defendant prison oﬃcials demonstrated that Howard
Smallwood failed to exhaust administrative remedies within
Indiana’s Pendleton Correctional Facility. But I reach that con-
clusion by traveling a diﬀerent path of reasoning.
 I.
 The case begins and ends for me with the grievance form
Smallwood prepared and submitted from a restricted housing
cell on November 1, 2017. All indications are that he com-
pleted the form in his own hand with a ballpoint pen, as the
signature matches other documents he signed on diﬀerent oc-
casions.
 In no uncertain terms, Smallwood complained that he
“was sexually abused by 5/6 custody oﬃcers [on] 10-22-17
Sunday in the inﬁrmary [upon] returning back to my cell” af-
ter being “forced into taking a blood test against my will” and
being “hurt during the process—[on my] wrist, back, neck
and hip.” Smallwood added that he had “contacted Sgt.
Dinkin and Oﬃcer William” about these matters and urged
some “independent person to review videotapes regarding
[the] sexual[ ] abuse and excessive force,” observing further
that the prison should “stop forcing inmates into taking blood
test[s] against their will.”
 In equally clear terms, the Indiana Department of Correc-
tion Oﬀender Grievance Process tells prisoners that they are
“not require[d] … to use any informal grievance process, or
to otherwise attempt to resolve with staﬀ, an alleged incident
24 No. 21-3047

of sexual abuse.” The same Grievance Manual also “re-
mov[es] the standard time limits on submission for a griev-
ance regarding an allegation of sexual abuse.”
 As best I can tell, the Department—and by extension, the
defendants—have never explained why this provision of the
Grievance Manual did not excuse Smallwood from pursuing
the so-called step zero measure of seeking informally to re-
solve his sexual-abuse complaint. To take a contrary position
and require informal resolution is at complete odds with the
language of the policy, so much so that compelling a prisoner
to follow that course would prove the grievance process at
best unworkable and at worst implemented in something less
than good faith. See Ross v. Blake, 578 U.S. 632, 643–44 (2016)
(explaining that remedies are not “available” within the
meaning of the PLRA when a prison’s policy is an adminis-
trative “dead end” or prison administrators “thwart” ﬁlings
through misrepresentation).
 I would stop there and remand to allow the district court
to hold a hearing to determine why, in the prison’s view,
Smallwood’s November 1 grievance was insuﬃcient to ex-
cuse any informal eﬀort to resolve his complaint with his al-
leged attackers. Something seems amiss with the Pendleton
Correctional Facility’s grievance process, and the district
court ought to get to the bottom of it. What Smallwood al-
leged in his grievance is as awful as it is clear, and the Depart-
ment’s policy of not forcing victims of sexual assault to con-
front their abusers seems directly on point. Smallwood is en-
titled to the same protection under the Department’s policy as
any other inmate who suﬀers sexual assault by prison staﬀ.
See generally J.K.J. v. Polk County, 960 F.3d 367 (7th Cir. 2020)
(en banc).
No. 21-3047 25

 Everything on paper points to Pendleton oﬃcials mishan-
dling Smallwood’s grievance. Perhaps one or another defend-
ant will have some explanation and be able to put everything
in a more clarifying and acceptable light. The current record
does not supply the answers, though. The majority is right to
return the case to the district court to allow an evidentiary
hearing under the procedure we established in Pavey v. Con-
ley, 544 F.3d 739, 742 (7th Cir. 2008).
 II.
 Nothing about my reasoning hinges on any conclusion
about Smallwood’s IQ, ability to understand or navigate the
Department’s grievance process, or access to other inmates to
assist with preparing and submitting any required paper-
work. Indeed, to my eye, Smallwood’s initial grievance was
admirable for its concision and clarity: anyone reading it
would see an inmate complaining of being sexually assaulted
and experiencing other harms in connection with a broader
incident involving a forced blood draw.
 No doubt the majority opinion is right to struggle with
how to deﬁne when a failure to exhaust can be excused be-
cause of a prisoner’s intellectual limitations. The questions we
should explore in future cases are many, including (to name
but a few):
 • At what point do intellectual limitations (manifesting,
 for example, in the form of illiteracy or diminished
 writing skills or a very limited formal education) be-
 come so severe as to inhibit compliance with an other-
 wise objectively reasonable administrative grievance
 process?
26 No. 21-3047

 • What must prisons aﬃrmatively do to show that ad-
 ministrative remedies are available to prisoners with
 intellectual limitations?
 • How should courts distinguish between prisoners with
 subjective unawareness of an institution’s grievance
 process and inmates with intellectual limitations sig-
 niﬁcant enough to prevent their compliance with ex-
 haustion requirements imposed by a prison?
 Howard Smallwood seems to have done everything re-
quired of an inmate who advances an allegation of sexual as-
sault by a prison guard. If the district court reaches that same
conclusion, we can save these and other hard questions about
where to draw the lines with prisoners with intellectual disa-
bilities for another case and day.
 For these reasons, I concur in today’s judgment.